UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Eleanore Sens, Chandan Khanna,
and Robin Legrand,

              Plaintiffs,

v.

Hennepin County Sheriff David
Hutchinson, *in his individual and
official capacities*, and John Does 1-4,
*in their individual capacities*,

              Defendants.

Civil No. 22-3009 (DWF/DTS)

MEMORANDUM
OPINION AND ORDER

## INTRODUCTION

This matter is before the Court on Defendants Hennepin County Sheriff David Hutchinson's ("Hutchinson") Motion to Dismiss. (Doc. No. 7.) Plaintiffs assert seven causes of action: Count I (against John Doe 1), Count II (against John Doe 1), Count III (against John Doe 1), Count IV (against Hutchinson), Count V (against John Does 2-4), Count VI (against Hutchinson and John Does 2-4); Count IV, and Count VII (*Monell* claim). Hutchinson now moves to dismiss all claims asserted against him in his individual capacity for failure to state a claim and lack of standing. Hutchinson also moves to dismiss the *Monell* claim. In the alternative, Hutchinson asserts that he is entitled to the defense of qualified immunity. Plaintiffs oppose the motion. For the reasons set forth below, the Court grants Hutchinson's motion and dismisses both the

claims asserted against Hutchinson in his individual capacity and the *Monell* claim. The claims asserted against the Doe Defendants remain.

## BACKGROUND

On April 11, 2021, Daunte Wright was shot and killed by a police officer in Brooklyn Center, Minnesota. Large protests ensued against police use of force. Here, Plaintiffs are three journalists—Eleonore Sens, Chandan Khanna, and Robin Legrand—employed by French news agency Agence France-Presse ("AFP"). Plaintiffs were sent on assignment to cover the resulting protests and civil unrest, including the coordinated response by law enforcement agencies. (Doc. No. 1 ("Compl.") ¶ 29.) Defendants are former Hennepin County Sheriff Hutchinson and John Does 1-4, who are unidentified Hennepin County Sheriff's Office ("HCSO") deputies and/or officers. (*Id.* ¶¶ 5, 6.) The HCSO was part of this coordinated response and later assumed command of the entire operation, led by Hutchinson. (*Id.* ¶ 20.)

On April 12, 2021, in response to the protests, Governor Tim Walz issued an Emergency Executive Order ("Order") declaring a peacetime state of emergency, authorizing federal, state, and local agencies to respond. (*Id.* ¶ 15.) City-wide curfews were ordered, including in Brooklyn Center. (*Id.* ¶ 16.) The Order specifically exempted "members of the news media" from the curfew. (*Id.*) Agencies coordinated a response through Operation Safety Net ("OSN"). (*Id.* ¶ 19.) OSN is an unincorporated association of law enforcement agencies that was assembled to conduct crowd control during protests expected to occur during the murder trial of Derek Chauvin. (*Id.* ¶ 18.)

Plaintiffs allege that during the Daunte Wright protests, Hutchinson had operational command of the law enforcement officers on scene leading up to and at the time of the relevant events on April 16, 2021.  (*Id*. ¶ 20.)  Specifically, Plaintiffs allege that on April 13, 2021, Brooklyn Center requested through the Hennepin County Chiefs of Police Asocciation for HCSO that HCSO to take the lead role in incident command, and that later that night HCSO and Hutchinson assumed command of the law enforcement response under a unified command structure.  (*Id*.)  As part of his role coordinating the response, Plaintiffs allege that Hutchinson received information in real-time via surveillance and communication systems, including drones, cameras, multi-team communications, and instant messaging.  (*Id*. ¶¶ 22-25.)  In addition, Plaintiffs allege that Hutchinson engaged in real-time communication with HCSO deputies and supervisors.  (*Id*.)

On April 16, 2021, Plaintiffs allege they were verbally harassed and physically assaulted by HCSO officers in retaliation for the exercise of their First Amendment rights.  It is undisputed that members of the press were expressly exempt from any nighttime curfew imposed during these protests, and therefore exempt from any dispersal order arising from violations of that curfew.  (*See* Doc. No. 9 ("McLaren Decl.") ¶ 7, Ex. 4 (Emergency Executive Order 21-17); *id*. ¶ 8, Ex. 5 (Emergency Executive

3

Order 21-18).)[1] And yet, Plaintiffs allege that while they were engaged in lawful reporting and "clearly identifiable as members of the press,"[2] the following occurred.

Beginning at 10 p.m., law enforcement officials issued a dispersal order to all assembled protesters. Plaintiffs allege that this order included journalists. (Compl. ¶ 39.) However, video evidence contradicts this and instead shows that the dispersal order does not mention the media. (McLaren Decl. ¶ 9, Ex. 6 at 1:24-1:57 and 4:58-5:30.) Plaintiffs stepped to the side of the crowd but continued to cover the protest, while some protesters began to run. (Compl. ¶ 40.) HCSO officers rushed into the crowd, yelling at protesters to "get on the fucking ground" and pepper spraying some who were trying to leave. (*Id.* ¶ 41.) Plaintiffs allege that an HCSO deputy pepper sprayed a journalist, Tim Evans, which Plaintiff Khanna was able to capture on camera. (*Id.* ¶ 42.) Plaintiffs allege that after seeing Khanna capture this moment, another HCSO deputy—John Doe 1—began assaulting Plaintiffs: pepper spraying Khanna, then pepper spraying Sens and Legrand, and then returning to pepper spray Khanna again, all captured in photographs included in Plaintiffs' Complaint. (*Id.* ¶¶ 43-44, 46.) During these events, Legrand allegedly shouted "PRESS! PRESS!" while HCSO deputies allegedly shouted at Plaintiffs to "GET ON THE FUCKING GROUND!" and "GET ON YOUR FUCKING KNEES!" (*Id.*

---

[1] The Court properly considers the executive orders as they are referenced in and embraced by the allegations in the Complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

[2] Plaintiff Khanna held two professional cameras and wore a press pass as well as a helmet that said "PRESS"; Plaintiff Sens carried a large professional camera; and Plaintiff Legrand wore a bright yellow vest that said "PRESS." (Compl. ¶¶ 31-33.)

¶¶ 49-50.) After Plaintiffs moved away from the scene, an HCSO deputy allegedly told Plaintiffs "you can't film this" and "if you point your camera [over there], I'll arrest you right now." (*Id.* ¶ 51.) Due to these attacks, Plaintiffs claim to have suffered severe physical pain as well as emotional trauma. (*Id.* ¶¶ 47-48, 53.)

Plaintiffs allege that these actions reflect broader issues with HCSO, particularly a "failure to train and supervise its deputies with respect to the First Amendment rights of journalists" and a "pattern and practice of targeting journalists in retaliation for the journalists' exercise of their First Amendment rights." (*Id.* ¶ 61.) Plaintiffs argue that HCSO and Hutchinson were aware of the unlawful use of force and First Amendment violations against journalists based on evidence of public critique and legal actions levied against law enforcement before April 16, 2021, including in the ongoing case of *Goyette, et al. v. City of Minneapolis, et al.*, No. 20-1302 (D. Minn. filed June 2, 2020).

Although initially arising from the protests following the murder of George Floyd, *Goyette* remains in litigation and its focus overlaps with this case. On April 14, 2021, plaintiffs in *Goyette* moved for a temporary restraining order ("TRO") based on the acts of law enforcement responding to the Daunte Wright protests. (Compl. ¶ 37.) A TRO was granted on April 16, 2021, approximately one hour before the alleged attacks on Plaintiffs. (*Id.* ¶ 35; *see* McLaren Decl. ¶ 6, Ex. 3 (*Goyette* TRO).) The *Goyette* TRO specifically enjoined the State Defendants from (a) "arresting, threatening to arrest, or using physical force" against journalists; (b) "using chemical agents" against journalists, or; (c) ordering journalists to "stop photographing, recording, or observing a protest." (Doc. No. 9-3 at 19-20.) While the injunction initially applied only to "State

5

Defendants,"[3] it was later broadened to apply to anyone "in active concert[4] or participation with an enjoined party." (McLaren Decl. ¶ 10, Ex. 7 (*Goyette* Preliminary Injunction at 27).)

Plaintiffs allege that law enforcement, including Hutchinson, were aware of the TRO and knew that their dispersal order directly violated the injunction. (Compl. ¶ 39.) They further argue that Hutchinson and Does 1-4 were aware of the motion for *Goyette* TRO filed days before and were on prior notice of the unconstitutional conduct identified in that motion, but that they failed to take any steps to "train, instruct, supervise, intervene, or [take] any other action to stop or reduce the risk of unconstitutional conduct against journalists covering the protests." (*Id.* ¶ 38.)

In opposition to Hutchinson's motion to dismiss, Plaintiffs submit and rely on the declaration of former Brooklyn Center Mayor Michael Elliott ("Elliott Decl.") that was filed in the *Goyette* case on January 19, 2023. (Doc. No. 466 in *Goyette v. City of Minneapolis*, 20-cv-1302 (WMW/DTS).) Defendants submit that the Court should decline to consider this declaration, as it is not included in the allegations of the Complaint and Plaintiffs failed to amend their Complaint as a matter of right to include

---

[3] "State Defendants" in *Goyette* were defined to include Minnesota Department of Public Safety Commissioner John Harrington, Minnesota State Patrol Colonel Matthew Langer, and "their agents, servants, employees, and representatives." (*Goyette* TRO at 19.)

[4] Even with this broadened language the *Goyette* Court declined to advise on who might be bound by the injunction other than the State Defendants, instead suggesting that each finding of "active concert" would require an individual examination of the factual circumstances underlying each case. (*Goyette* Preliminary Injunction at 27.)

them. Plaintiffs argue that the Court may consider the declaration as a matter of public record or, at a minimum, that they should be permitted to amend their Complaint to include the allegations from the Elliott Declaration. Defendants respond that any such amendment would be futile under Rules 12 and 15. The Court declines to consider the Elliot Declaration except to the extent that it is alleged in the Complaint. *See Vogt v. Crow Wing Cnty.*, Civ. No. 21-1055, 2021 WL 6275271, at *8 (D. Minn. Nov. 1, 2021) ("However, this allegation was not in the Complaint, and therefore cannot be a basis for denying the motion to dismiss."), *report and recommendation adopted*, Civ. No. 21-1055, 2022 WL 37512 (D. Minn. Jan. 4, 2022). The Court notes, however, that even if the Court had considered the declaration, the Court's decision would be the same. Further, because the Court declines to consider the Elliott Declaration, it also declines to consider the underlying Resolution and other documents described in that declaration, as attached to the Second McLaren Declaration (Doc. No. 19) ("2d McLaren Decl.").[5]

---

[5] The Court notes that in his declaration, Elliott attests to the following: (1) Brooklyn Center City Council passed a "Resolution Limiting Police Crowd Control Tactics During Protests" [the "Resolution"] in response to constitutional violations by police on April 12, 2021; (2) that the Resolution "prohibited the use of tear gas and other chemical irritants during the protest response, use of less-lethal 'rubber bullets' against protesters, mass arrest or 'kettling' of protesters, and other violent crowd control techniques"; and (3) that the Resolution "specifically noted that police should not prevent people from videotaping law enforcement and explained that the prohibited tactics 'directly impact the rights of First Amendment Assemblies and mass demonstrations.'" (*Id.* ¶ 3.) Elliott further attests that the passage of the Resolution irritated Hutchinson and that Hutchinson implored Elliott to rescind the Resolution or to alter it in a way so as to allow him to direct deployment of tear gas and other crowd control munitions. (Elliott Decl. ¶ 5.) Elliott states that faced with an ultimatum from Hutchinson, he issued a proclamation clarifying that the Resolution applied only to Brooklyn Center police, and not HCSO. (*Id.* ¶ 6.) The proclamation also states that the Resolution "does not apply to

## DISCUSSION

### I. Motion to Dismiss

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *See Porous Media Corp.*, 186 F.3d at 1079.

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S.

---

joint law enforcement operations" occurring in Brooklyn Center. (2d McLaren Decl. ¶ 5, Ex. B.) *The Court reiterates that these facts, if considered, would not alter the Court's decision herein.*

at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II.   Individual Capacity Claims Against Hutchinson: Supervisory Liability

Plaintiffs allege claims for failure to supervise and failure to intervene against Hutchinson in his individual capacity with respect to the officers' alleged constitutional violations. In support, Plaintiffs allege that Hutchinson: (1) had direct command authority over the law enforcement response to the protests; (2) exercised that command by directing the actions of the law enforcement officers; (3) had chief policy-making authority at HCSO; (4) issued commands that resulted in the alleged constitutional violations; (5) was aware of prior unconstitutional conduct against journalists; (6) was specifically aware of the conduct against Plaintiffs; and (7) did not address the violations.

Plaintiffs do not allege that Hutchinson personally used force on them. Instead, they seek to hold him liable in his supervisory capacity. There are two ways for a plaintiff to show that a supervisor's own actions violated their constitutional rights: direct participation and failure to train or supervise. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010); *see also Cole v. Does*, 571 F. Supp. 3d 1033, 1042 (D. Minn. 2021).

### A.   Direct Participation

Plaintiffs do not allege that Hutchinson was physically present during the alleged events. Plaintiffs argue that they have sufficiently pleaded Hutchinson's personal involvement because as the on-site commander, he had the authority to direct the officers not to harass or assault members of the media and did not do so. In addition, Plaintiffs allege that Hutchinson tracked the protests and law enforcement response through various

9

surveillance and communication mechanisms, led the planning and execution of the police response, was HCSO's chief policymaker, and personally gave the order to disperse. Plaintiffs argue that Hutchinson knew of unconstitutional conduct toward journalists in the days before the events and was aware that HCSO had past problems with unconstitutional conduct toward journalists. Plaintiffs argue that these allegations, together, show that Hutchinson had the authority to supervise and control the Doe officers, but that he failed to do so and instead encouraged and ratified their alleged misconduct.

To state a claim for supervisory liability under a direct participation claim, Plaintiffs must allege that Hutchinson was personally involved in, or that he ordered or directed, the constitutional violations at issue. *See Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018) (where defendants neither "ordered or directed" an inferior officer to violate a plaintiff's rights, "their alleged liability cannot be based on direct participation").[6] Plaintiffs have failed to do so. Plaintiffs do not allege that Hutchinson was on the ground, and they have not sufficiently alleged that Hutchinson directly ordered any of the Doe officers to take the alleged unconstitutional actions towards Plaintiffs or journalists in general. While Plaintiffs have alleged that Hutchinson issued the dispersal order, that order does not specifically mention journalists or the media. In

---

[6] To the extent that Plaintiffs allege individual liability claims against Hutchinson for a failure to supervise, the Court considers that argument separately from a direct action theory. *See, e.g., Cole*, 571 F. Supp. 3d at 1042 ("A failure to supervise an officer who commits a constitutional violation is not the same thing as being personally involved in that constitutional violation.").

addition, the issuance of a lawful dispersal order was not prohibited by the *Goyette* TRO. (*Goyette* TRO at 2 ("the State Defendants are not precluded by the Order from issuing otherwise lawful crowd-dispersal orders").) There are no facts alleged that would demonstrate that in issuing the dispersal order, Hutchinson directed or ordered the officers to use force on or otherwise violate the constitutional rights of Plaintiffs. For this reason, the Court concludes that Plaintiffs have failed to plead a claim against Hutchinson under a theory of direct participation.

      B.     *Failure to Supervise*

Even when a supervising official did not directly participate in alleged constitutional violations of his inferior officers, he may still be liable under § 1983 when his failure to supervise and train caused the deprivation of rights. "[A] supervisor may be liable for the acts of a subordinate if injury is inflicted upon the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control the actions of subordinates." *Hahn v. McLey*, 737 F.2d 771, 773 (8th Cir. 1984) (per curium). Liability for failure to supervise and train may arise when a supervising officer: (1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized the acts; and (3) failed to take sufficient remedial action; which (4) caused injury. *Sturgeon v. Faughn*, 36 F.4th 804, 809 (8th Cir. 2022). Allegations of generalized notice are insufficient and prior misconduct must be very similar to the conduct giving rise to the present claims. *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

11

Plaintiffs allege that even before the Daunte Wright protests in April 2021, HCSO had a history of violating journalists' rights and that Hutchinson knew of that history. For example, Plaintiffs allege that Hutchinson knew that in 2016, HCSO deputies who assisted with the response to the Dakota Access Pipeline protests arrested, assaulted, and pepper-sprayed journalists (Compl. ¶¶ 57, 59) and that HCSO had booked and detained journalists during the George Floyd protests, even after those journalists had identified themselves as members of the press (*id.* ¶¶ 58, 59).[7] Further, Plaintiffs point to Hutchinson's knowledge of the *Goyette* case, wherein the plaintiffs alleged law enforcement misconduct during the George Floyd protests as well as a pattern of misconduct by State law enforcement agencies. Even though Hutchinson was not a defendant in that case, Plaintiffs claim that the lawsuit put Hutchinson on notice that his deputies at HCSO needed additional supervision and training with respect to the issues *Goyette* raised, including claims for failure to intervene and misconduct towards members of the press covering protests. In addition, Plaintiffs allege that *Goyette* plaintiffs had filed a motion for a TRO on April 14, 2021, in which they detailed law enforcement misconduct and put Hutchinson on notice of such misconduct occurring

---

[7] In addition, Plaintiffs allege that Elliott asserts that he confirmed that Hutchinson monitored the protest response and directed events "moment-to-moment in real time" each evening, and that he "watched as Hutchinson and those under his command violated the First Amendment rights of protesters and journalists." (Elliott Decl. ¶ 10.) Elliott further asserts that Hutchinson affected a "tough guy" persona and stated "that he and law enforcement would do whatever it took to quell the protests . . . regardless of how it impinged on individuals' First Amendment rights." (*Id.* ¶ 11.) Further, Elliott stated that he complained publicly and privately to Hutchinson about HCSO's misconduct, but that Hutchinson was unmoved. (*Id.*)

during the Daunte Wright protests.  (*Id*. ¶¶ 37-38.)  At roughly 9 p.m. on April 16, 2021, the Court granted the *Goyette* plaintiffs' motion barring the State Patrol from arresting, threatening, using pepper spray and other less-lethal weapons on journalists, or ordering journalists to disperse.  (*Id*. ¶ 39.)  Plaintiffs claim that this TRO applied to HCSO as an agency acting in concert with the State Patrol.  (*Id*. ¶ 36.)  Plaintiffs also claim that Hutchinson was aware of this TRO before he gave the dispersal order at issue here. (*Id*. ¶¶ 38-39.)

After careful consideration of Plaintiffs' allegations, the Court finds that Plaintiffs have failed to sufficiently plead a claim for supervisory liability against Hutchinson based on a theory of failure to supervise or train.  Plaintiffs argue that they have alleged a past pattern of misconduct of which Hutchinson had notice and to which Hutchinson was deliberately indifferent.  However, the facts alleged do not suffice and, instead, conflate different actions taken by different agencies.  For example, Plaintiffs point to a 2016 incident involving the alleged use of force by HCSO deputies against protesters and journalists, allegations of arrests of journalists by other law enforcement agencies, and lawsuits arising out of the protests.  These incidents, however, are not sufficient to support a claim for supervisory liability here because they do not plausibly allege notice of a pattern of unconstitutional acts by subordinates that are similar to those inflicted on Plaintiffs.  The allegations regarding the 2016 incident lack detail and do not include allegations that any complaints of misconduct were filed or that Hutchinson had notice of these acts.  Similarly, Plaintiffs' allegations regarding arrests of journalists by other agencies and other lawsuits lack detail and do not show a pattern of unconstitutional

13

conduct of which Hutchinson was aware and on notice. Plaintiffs also highlight the contents of the Elliott Declaration. These allegations, however, even if properly considered, do not suffice.

Because Plaintiffs have failed to plausibly allege a pattern or practice of misconduct by Hutchinson's subordinates to which Hutchinson was deliberately indifferent, Plaintiffs' supervisory liability claim fails.

C.     *Failure to Intervene*[8]

Plaintiffs also allege a claim for failure to intervene against Hutchinson. To state a failure to intervene claim, Plaintiffs must show that a defendant "observed or had reason to know that excessive force would be or was being used." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015). In addition, Plaintiffs must allege facts showing that the defendant had an opportunity to intervene and failed to do so. *Krout v. Goemmer*, 583 F.3d 557, 565-66 (8th Cir. 2009); *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009). "Supervisory officers who act with 'deliberate indifference toward the violation,' . . . or, in other words, are aware that their subordinates' actions create a

---

[8]     The Eighth Circuit has only recognized a failure to intervene in the context of excessive force claims. *See Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012). Plaintiffs submit that a majority of other circuits have recognized a duty to prevent other constitutional violations. Even assuming that the duty applies to other constitutional violations, Plaintiffs' claim fails here.

'substantial risk of serious harm,' may be liable if they fail to intervene to mitigate the risk of harm. *Baude v. Leshock*, 23 F.4th 1065, 1074 (8th Cir. 2022) (citation omitted).[9]

Here, Plaintiffs allege that, despite not being physically present, Hutchinson monitored the situation on the ground through various surveillance and communication means. Plaintiffs argue that, as alleged, Hutchinson had command authority, personally planned and executed the protest response, supervised and communicated in real-time with the response team, was aware of unconstitutional conduct against journalists during the protests, and failed to curb mistreatment. Plaintiffs argue that these facts plausibly establish Hutchinson's opportunity to prevent and interrupt his subordinates' misconduct. Plaintiffs also assert that they have sufficiently alleged that Hutchinson intended the use of excessive force by his order to disperse protesters *and* journalists. In support, Plaintiffs rely on the Elliott Declaration (describing Hutchinson's "tough guy" persona

---

[9] In *Baude*, the Eighth Circuit Court of Appeals considered, among other issues, whether the plaintiffs had sufficiently pled claims of excessive force against the supervising officers for failing to intervene. The Eighth Circuit concluded that the supervisory officers were not entitled to qualified immunity on the ground that the plaintiff alleged that "supervisory officers observed or intended the use of excessive force," and that "the supervisors issued orders allowing their subordinates to use excessive force against an allegedly peaceful crowd." 23 F. 4th at 1074. The facts of this case, however, are distinguishable. Here, Plaintiffs do not plausibly allege that Hutchinson issued a direct order to use excessive force or violate the First Amendment rights of Plaintiffs or journalists in general, or that Hutchinson issued any order that allowed for the subordinate officers' use of force. Nor do Plaintiffs plausibly allege that the supervisory officers specifically observed or intended the use of force used against Plaintiffs, or that through Hutchinson's monitoring of the situation that he had time or the opportunity to intervene in the acts that form the basis of this case.

15

and private expressions of contempt for the constitutional rights of journalists). (Compl. ¶ 62; Elliott Decl. ¶¶ 10-12.)

The Court disagrees. The Court acknowledges that whether the alleged level of Hutchinson's monitoring constitutes the level of "observation" required to state a failure to intervene claim is not clear. Even assuming that it suffices, however, the Court finds that Plaintiffs have not sufficiently alleged that Hutchinson had the opportunity intervene in any specific act of excessive force or other alleged unconstitutional act. Courts have differentiated between defendants who are present during the application of excessive force and those who are not in considering claims for failure to intervene. *See, e.g.*, *Kaplan v. Harrington*, Civ. No. 22-640, 2023 WL 1797872, at *13 (D. Minn. Feb. 7, 2023) (holding that plaintiffs failed to state a claim for failure to intervene against Hutchinson where plaintiffs had not plausibly alleged that Hutchinson had the opportunity to intervene in the use of force by officers, despite similar allegations of Hutchinson's oversight and real-time observation of the protest response).

There being no allegation that Hutchinson was physically present, Plaintiffs must allege facts showing that Hutchinson was aware of and monitoring the situation in such a way that provided the immediate opportunity to intervene in the fast-moving actions that night that led to Plaintiffs' excessive force claims. Plaintiffs have not done so. Therefore, the Court finds that Plaintiffs have failed to plead a plausible claim for failure to intervene against Hutchinson.

### III.  *Monell* Claim

A suit against Hutchinson in his official capacity is in essence a suit against Hennepin County. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). A municipality may be held liable under § 1983 if it, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, (1978). Municipal liability exists "only where the municipality itself causes the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A plaintiff thus must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id*. at 404. The plaintiff also must show deliberate indifference to or tacit authorization of the conduct and acts performed pursuant to an unofficial custom and a direct causal link between the custom and the deprivation of rights, i.e., that "the municipality was the 'moving force' behind the injury alleged." *Id*. (quoting *Monell*, 436 U.S. at 694). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405.

Here, Plaintiffs claim that HCSO had a custom and policy of failing to train, supervise, and issue corrective action even "after injunctive relief issued by this Court, which caused Defendants to violate the First Amendment rights of Plaintiffs." (Compl. ¶ 129.) Plaintiffs' *Monell* claim is based on the *Goyette* TRO, allegations that HCSO officers used force against protesters and journalists in 2016, allegations that HCSO was aware of protesters arrested and jailed by other law enforcement agencies, and various lawsuits against law enforcement related to the George Floyd protests. These allegations, however, are not sufficient to put HCSO on notice of alleged wrongdoing by its employees, to establish a persistent pattern of unconstitutional conduct so as to have the force of law, or to show that the alleged custom was the "moving force" behind the officers' actions on April 21, 2021. Other than the actions of HCSO officers on April 16, 2021, Plaintiffs rely on the *Goyette* lawsuit to demonstrate facts that would have put HCSO on notice of a pattern of misconduct that they failed to correct before April 16, 2021. Hennepin County, HCSO, and Hutchinson were not parties in *Goyette*. (McLaren Decl. ¶ 4.) In fact, Hutchinson was not joined as a party in *Goyette* until *after* the events on April 16, 2021. (*Id*. Ex. 1.) In addition, in *Goyette*, the plaintiffs did not allege excessive force against Hutchinson or HCSO employees. And significantly, when the *Goyette* TRO first issued, neither Hennepin County nor Hutchinson were parties and, thus, not subject to the TRO. (*Id*. ¶ 3.) Because the allegations against Hennepin County and Hutchinson in *Goyette* were made after April 16, 2021, they could not have been the "driving force" behind the alleged violations on that day. Plaintiffs have also failed to allege that HCSO acted with deliberate indifference by failing to train.

18

The Court also concludes that the 2016 use of force at Standing Rock is insufficient to establish a constitutional custom. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (explaining a single incident does not suffice to prove a custom; finding fifteen complaints of excessive force, most of which were not sustained after a departmental investigation, insufficient to state a *Monell* claim). And Plaintiffs' allegations pertaining to constitutional violations by other law enforcement agencies and lawsuits against law enforcement agencies after the George Floyd protests are too vague and disconnected to the decisions of Hutchinson to demonstrate an official policy or custom at HCSO.

For the above reasons, Plaintiffs have failed to plausibly allege the existence of an unconstitutional policy or custom within Hennepin County or HCSO and that any such policy was the "moving force" behind the alleged constitutional deprivations on April 16, 2021. The Court concludes that Plaintiffs' *Monell* claim is properly dismissed.

## CONCLUSION

The Court notes that in issuing this Order, the Court does not take lightly Plaintiffs' allegations against the HCSO officers. The Court simply finds that Plaintiffs have not plausibly alleged supervisory or *Monell* liability. The Court notes, without commenting on the merits of the claims, that the alleged use of pepper spray and inappropriate language is, at a minimum, extremely unprofessional. The claims against the Doe Defendants remain and the facts regarding those actions will be brought to light. The Court urges the parties to consider resolving this matter as it appears that settlement would be in the best interests of the parties, justice, and the public.

## ORDER

Based on the files, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Hutchinson's Motion to Dismiss (Doc. No. [7]) is **GRANTED** as follows:

    a. Counts IV and VI are **DISMISSED WITH PREJUDICE** as they are asserted against Hutchinson and Hutchinson is **TERMINATED** as a party to this action.

    b. Count VI (the *Monell* claim) is **DISMISSED WITH PREJUDICE**.

    c. Claims against Doe Defendants remain.

Dated: September 27, 2023            s/Donovan W. Frank
                                     DONOVAN W. FRANK
                                     United States District Judge